United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER CAMP,<br>Plaintiff,<br>v.<br>LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br>Defendant. | Case No. 25-cv-06199-AMO<br><br>**ORDER RE CROSS-MOTIONS FOR JUDGMENT PURSUANT TO RULE 52**<br><br>Re: Dkt. Nos. 26, 28 |

This is an Employee Retirement Income Security Act ("ERISA") case. The parties' cross-motions for judgment pursuant to Federal Rule of Civil Procedure 52 were heard before this Court on August 19, 2026. Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court **DENIES** Plaintiff's motion for judgment and **GRANTS** Defendant's motion for judgment for the following reasons.

## I. FINDINGS OF FACT

1. Plaintiff Christopher Camp was a participant in a group long-term disability insurance plan (the "Plan"), effective as of January 1, 2016, issued and administered by The Lincoln National Life Insurance Company ("Lincoln National") to Yelp, Inc.[1]

2. The Plan is governed by ERISA.

3. The Plan provides long-term disability ("LTD") benefits following a 90-day elimination period for covered disabilities.

[1] The Court adopts findings of fact enumerated 1-10 pursuant to the parties' joint proposal. *See* Dkt. No. 38.

4. Camp began working for Yelp, Inc. on April 4, 2022, and at the relevant time, held the position of Elite Account Director at Yelp, Inc.

5. Camp ceased working on or around January 30, 2024.

6. Lincoln National approved Camp's short-term disability ("STD") benefits through the maximum STD period.

7. Following exhaustion of STD benefits, Lincoln National evaluated Camp's claim for LTD benefits.

8. Lincoln National denied the LTD claim by letter dated July 31, 2024.

9. Camp appealed the denial by letter dated November 6, 2024.

10. Lincoln National upheld the LTD denial in a final decision dated April 17, 2025.

**A. The Policy**

11. On January 1, 2016, Lincoln National issued Group Disability Income Policy No. GF3-860-066822-01 (the "Policy") to Yelp, Inc. ("Yelp") in California. Camp was a Class 1 employee under the Policy. Administrative Record ("AR") 21.[2]

12. Under the Policy, "Disabled" means "that during the Elimination Period and the next 24 months," the insured is "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue his Own Occupation in the usual and customary way" as a result of Injury or Sickness. AR 26.

13. "Own Occupation" means the insured's "occupation that he was performing when his Disability or Partial Disability began." AR 30.

14. The Policy provides that Lincoln National will pay an eligible Class 1 employee a Disability Benefit of 60% of Basic Monthly Earnings when Lincoln receives Proof that a Covered Person is Disabled due to Injury or Sickness after the end of the Elimination Period which is the greater of the end of STD benefits or 90 days. AR 22, 27, 39.

15. "Proof" means "written proof covering the occurrence, the character and the extent of the loss for which the claim is made." AR 32.

---

[2] Citations to the Administrative Record refer to the Bates numbers of the pages lodged at Docket No. 27.

United States District Court
Northern District of California

**B. Claim Background**

16. On April 4, 2022, Camp began working for Yelp as an account executive primarily involved in sales and handling customer accounts. AR 1017, 356-357.

17. On January 9, 2024, Camp saw Dr. Gahassan Rahhal, a specialist in internal medicine and Camp's primary care physician, for an annual exam. AR 579. Camp reported that he had been feeling well and his physical exam was normal. AR 579-581.

18. On January 29, 2024, Camp stopped working. AR. 1.

19. On January 31, 2024, Camp returned to Dr. Rahhal. AR 588. Camp complained of left ear tinnitus (ringing in the ear), which he reported began a few weeks prior and contributed to insomnia. AR 588. Camp reported a prior incident of left ear hearing loss lasting about 15 to 20 minutes several months prior, Dr. Rahhal's note reflects that Plaintiff reported that it "resolved spontaneously without recurrence." AR 588. In the course of the January 31, 2024 exam, Dr. Rahhal recorded that he found that Camp was "alert with normal behavior," "not in acute distress," and his review of systems noted, "negative for agitation, behavioral problems, confusion, hallucinations, self-injury and suicidal ideas." AR 589-90. Camp reported to Dr. Rahhal that he was "going to take off duty for 30 days." AR 588. Dr. Rahhal referred Camp to an ear, nose and throat ("ENT") specialist. AR 590.

20. On February 28, 2024, Camp saw Dr. R.H. Mehta, an ENT specialist. AR 109. Camp reported that the onset of tinnitus was "sudden," "4 weeks ago," and that he "woke with it." AR 109. On exam, Camp's hearing measured within normal limits, with mild sensorineural hearing loss of the right ear. AR 110. Dr. Mehta noted that Camp was "alert, oriented x3, appears calm, Cranial nerves II-XII grossly intact." AR 110.

21. On March 8, 2024, Camp had an MRI of his auditory canals, which was unremarkable. AR 115.

22. On March 9, 2024, Camp began seeing Alex E. McKibbin, a Licensed Clinical Professional Counselor, for cognitive therapy related to the tinnitus. AR 125. Camp denied any psychological symptoms or difficulties but reported depression and anxiety due to tinnitus. AR 125.

23. On April 3, 2024, Camp reported to McKibbin that he was "unable to work" due to tinnitus. AR 123. McKibbin assessed that Camp had made "moderate progress" since his last visit. AR 123.

24. By letter dated April 4, 2024 addressed to Yelp, McKibbin recommended that Camp "remain on short term disability" while he attempted to stabilize his condition. AR 129.

25. On April 5, 2024, Camp saw a second ENT specialist, Dr. Matthew R. Bartindale. AR 106. During the visit, Camp told Dr. Bartindale that his symptoms included "tinnitus and headache" and did not include "hearing loss, dizziness, ear fullness or ear pain." AR 106. Dr. Bartindale further noted, "Patient denies headache and dizziness" and that Camp had bought "JABRA OTC hearing aids with tinnitus maskers which has helped some." AR 106. Camp's physical exam was largely normal, and he was able to communicate with no noted issues. AR 108. Dr. Bartindale determined that Camp's hearing measured within normal limits, although he had asymmetrical sensorineural hearing loss. AR 107. Dr. Bartindale diagnosed Camp with tinnitus and recommended hearing aids, tinnitus maskers, cognitive therapy, and participation in a support group. AR 107. Dr. Bartindale described progressive treatment options for tinnitus, including use of tricyclic antidepressants to reduce intensity, but he expressly did not recommend prescription medication for Camp because "he is improving with his management of the tinnitus." AR 107.

26. Dr. Bartindale completed an Attending Physician's Statement ("APS") and identified Camp's primary diagnoses as "tinnitus" with a secondary diagnosis of "asymmetrical sensorineural hearing loss." AR 118. He noted symptoms of "tinnitus, headache, difficulty sleeping, constant ringing, and difficulty focusing." AR 118. Dr. Bartindale left the spaces on the APS for restrictions and limitations ("R/Ls") blank and failed to note a date for either "reduced ability to work" or "advised to stop work," although he completed dates for "symptoms first appeared" (January 30, 2024), "initial treatment," (February 28, 2024), and "most recent treatment" (April 5, 2024). AR 119.

27. On April 8, 2024, Camp returned to Dr. Rahhal. AR 193. Dr. Rahhal noted that Camp had tinnitus for which he "has been wearing hearing aids with some improvement in



United States District Court
Northern District of California

symptoms." AR 195. On physical exam, Camp was not in acute distress, and his ears were normal. AR 196. Dr. Rahhal noted that Camp claimed that his hearing loss and tinnitus were "affecting his daily life and potential performance at work due to depression as well." AR 196. Dr. Rahhal prescribed Lexapro for depression and Ambien for insomnia. AR 196.

28. On April 12, 2024, Dr. Rahhal completed an APS and stated that Camp could not work due to tinnitus and moderate depression, noting symptoms of "loss of hearing, brain producing loud ring sound (constant), and moderate depressive symptoms." AR 1047.

29. On April 12, 2024, Lincoln National had a nursing memorandum prepared to assess Camp's condition. AR 1041. Based on the documentation of tinnitus, depression, and insomnia, the nurse found the following support R/Ls reasonable: no working at unprotected heights, no working with moving machinery, no activities which require constant or quick eye movements, no quick or sudden jerking movements, no quick or repetitive bending, no multi-step tasks, no tasks requiring attention to detail, no tight deadlines, and the ability to use a headset compatible with hearing aids. AR 1041. The nurse recommended reassessing Plaintiff's status on April 27, 2024, to evaluate the efficacy of his medications. AR 1041.

30. On April 17, 2024, Camp returned to Dr. Rahhal for completion of FMLA paperwork. AR 188-89. Dr. Rahhal noted that Camp had "no change in medical condition." AR 189. He noted "depression has not worsened and he seems to tolerate Lexapro well without having any apparent side effects." AR 189. On exam, Camp was not in acute distress, and his ears appeared normal. AR 190. Dr. Rahhal completed a Reasonable Accommodation Medical Certification Form for Camp. AR 1035-38. Dr. Rahhal indicated on the form that there were no accommodations that would enable Camp to perform his essential job functions due to tinnitus and depression. AR 1036-37.

31. On April 21, 2024, Camp completed an Activities Questionnaire. AR 89. Therein, Camp stated that he could not work due to tinnitus but noted that he continued to communicate with others in person and over the phone, and he reported that he was able to perform all activities of daily living ("ADLs") independently. AR 89-91.

United States District Court
Northern District of California

32. On April 25, 2024, Camp returned to McKibbin and reported that he was let go from work. AR 122. McKibbin again noted moderate progress. AR 122.

33. On April 30, 2024, McKibbin completed a Treating Provider Statement. AR 145. McKibbin indicated on the form that Camp could not work because tinnitus made him irritable and caused a lack of sleep. AR 145. McKibbin stated, "[a]lthough patient has learned some coping skills, relaxation techniques and distraction techniques, he states his condition has actually increased causing him more discomfort." AR 145.

34. On May 22, 2024, Dr. Rhonnie Song, a family medicine physician, reviewed Camp's records at Lincoln's request. AR 287-89. Dr. Song identified Camp's diagnoses as tinnitus, asymmetrical sensorineural hearing loss and insomnia. *Id.* Dr. Song determined that Camp was capable of working with the following R/Ls: (1) no safety sensitive activities, including working at unprotected heights or operating heavy machinery; and (2) ability to use a headset with compatible hearing aids. AR 287. Lincoln National forwarded Dr. Song's review to Dr. Rahhal on May 24, 2024, to provide an opportunity for Dr. Rahhal to comment upon the report and provide any supporting documentation. AR 291-92.

35. On May 31, 2024, Dr. Sudhakar Morthala, a specialist in psychiatry and neurology, prepared a medical review at Lincoln National's request. AR 313-17. Dr. Morthala found no evidence in Camp's records of an ongoing, impairing primary psychiatric diagnosis. AR 313. Dr. Morthala noted the absence of abnormal mental status exams, suicidal or homicidal thoughts, or cognitive deficits and noted psychiatric findings were generally limited and based on self-reports, noting:

> From a psychiatric standpoint, the available records would *not* be supportive of impairment and R/Ls from 1/30/24 onwards. Psychiatric findings in these records are generally limited and based on self-reports. There is evidence of the claimant's subjective reports such as feeling sad, anxious, irritable, sleep/concentration issues etc. which were mainly stemming from tinnitus. There is no evidence of some findings which would be more reliably associated with greater severity and impairment such as consistently abnormal mental status examinations, active suicidal/homicidal thoughts, delusions, hallucinations, mania, major cognitive deficits on testing, psychosis etc. From a treatment standpoint, the claimant was prescribed Escitalopram by his PCP, Ghassan Rahhal, MD, and

> receiving psychotherapy from Alex McKibbin, LCPC. This treatment plan is reasonable for his reported mood/anxiety symptoms, but would not have to be requirement [sic] for work restrictions. There is no evidence of active medication management, especially by a psychiatrist, at least weekly psychotherapy, or referrals to a psychiatrist or higher levels of care (IOP/PHP, inpatient), as would have been seen if there was severe depression/anxiety. In the absence of some significant findings as noted above, the available information would not be sufficient to support impairment and any psychiatric based R/Ls.

AR 313-14. Dr. Morthala noted, "Individuals with mild or even moderate depression/anxiety commonly start medications such as Escitalopram, and also tolerate further adjustments and receive more frequent psychotherapy, while carrying out their usual daily activities, including job duties. Objective findings would be required to support impairment, but there is limited evidence here." AR 316.

36. On June 5, 2024, Camp wrote to Dr. Rahhal and asked Dr. Rahhal to tell Lincoln National that he was "not able to go back" to work. AR 380. Dr. Rahhal responded on June 7 and noted that the disability company had asked to see "some evidence of some other findings which would be more reliably associated with greater severity and impairment such as consistently abnormal mental status exam hallucination, major cognitive deficits on testing, psychosis etc." and that the company said, "there is no evidence of active medication management especially by a psychiatrist, at least weekly psychotherapy, or a referral to a psychiatrist for higher level of care." AR 379. Dr. Rahhal then stated that "I will type up a letter for the disability company but I do also recommend you be evaluated by psychiatry service – referral has been entered into the system and see your psychotherapist at least once weekly." AR 381.

37. On June 10, 2024, Lincoln National prepared an Occupational Analysis ("OA") and determined that Camp's occupation was most consistent with the occupation of an account executive, which was sedentary. AR 356. Notably, the OA supported that Camp's occupation did not require climbing, balancing, bending/stooping, crouching/squatting, kneeling, crawling, or any "safety sensitive activities." AR 357.

38. On June 14, 2024, Camp again asked Dr. Rahhal to send a response to Lincoln National informing them that he has "sever [sic] tinnitus along with anxiety and depression." AR

379. Camp noted he was in Arizona "spending time with the kids which helps with the stress and boredom of not working." AR 379.

39. Dr. Rahhal prepared a letter dated July 2, 2024, stating that Camp's tinnitus interfered with his daily life and job activities. AR 419.

40. By letter dated June 18, 2024, McKibbin responded to Dr. Morthala's May 31, 2024 report. AR 368. McKibbin wrote that Camp's condition interfered with his ability to "engage in social activities, work or even talk on the telephone." AR 368. McKibbin enclosed with his response a personality assessment screener dated March 20, 2024, but the document revealed Camp's scores were mostly normal to mild or moderate and not indicative of impairment. AR 370-71.

41. On June 25, 2024, Camp established care with Dr. Blair T. Butterfield, a family medicine practitioner. AR 626. Camp's physical exam was normal. AR 628. Dr. Butterfield described Camp as "in no acute distress," and for psychiatric findings he recorded, "cognition intact, good judgement and insight," and the escitalopram was refilled. AR 628. Dr. Butterfield referred Camp to a third ENT, Elicia Hunt (ENT PA), for tinnitus. AR 628.

42. On July 2, 2024, Camp began seeing therapist Nathan Goltsman via telehealth. AR 409. Goltsman diagnosed Camp with depressive disorder due to another medical condition and "other problems related to employment." AR 412.

43. On July 3, 2024, Camp saw Hunt, the ENT specialist. AR 425. Camp's ear exam was normal. AR 425. Hunt reported that his tinnitus was "somewhat helped by relaxation techniques." AR 425. Hunt recommended distraction techniques and referred Camp to a hearing specialist for new hearing aids. AR 425.

44. On July 10, 2024, Lincoln National prepared an Occupational Analysis Addendum ("OA Addendum") to acknowledge that Camp's occupation required frequent hearing, speaking, and listening. AR 431-32.

45. On July 19, 2024, Dr. Morthala updated his report based on the OA Addendum, but his opinion remained unchanged. AR 440. Dr. Morthala stated that Camp failed to provide substantial clinical evidence of psychiatric impairment such as major mental status exam findings,

persistently severe symptoms and treatment intensity consistent with an ongoing, impairing primary psychiatric condition. AR 440. Dr. Morthala sent Goltsman and McKibbin letters summarizing his discussions with them. AR 436-39. On July 22, 2024, McKibbin signed Dr. Morthala's summary of their conversation with "no changes/comments." AR 444.

46. On July 29, 2024, Dr. Kristin Egan, a specialist in otolaryngology – head and neck surgery, prepared a medical record review at Lincoln's request. AR 455. Dr. Egan stated that, "[t]aking into consideration the entire clinical picture, including evidence-based medicine and any medication or other treatment side effects, from an Otolaryngology perspective, no supported level of impairment translates into" R/Ls. AR 455. Dr. Egan noted that Camp used hearing aids, tinnitus maskers, and cognitive therapy. AR 455. "With the use of [hearing aids], there are no disability restrictions." AR 455. Dr. Egan noted that she had conferred with Dr. Bartindale, who stated that he had only seen Camp once and wished "to abstain from disability restriction discussion as he does not make disability determinations." AR 456.

47. On July 30, 2024, Camp returned to Dr. Butterfield for an annual exam. AR 618. Camp reported that he took Lexapro but he was out of Ambien and had difficulty sleeping without it. AR 619. Camp did not appear in any acute distress and had a normal physical exam. AR 619. The only mention of tinnitus was under "past medical history." AR 618.

48. On the same day, Camp underwent a remote psychiatric evaluation with counselor Russell Silverberg, which was normal. AR 652, 654. Camp reiterated his "ability to perform ADLs independently." AR 652. Camp denied that he posed a threat of harm to himself or others and denied that he experienced paranoia. AR 652-53. Despite prior complaints of insomnia, Camp denied issues with sleep initiation or maintenance. AR 652. Camp's appearance was within normal limits, his attitude cooperative, mood euthymic, affect full, speech clear, thought process logical, perception normal, thought content normal, cognition normal, and insight and judgment normal. AR 654-55. Silverberg assessed Camp with "depressive disorder due to another medical condition" based on Camp's report that he felt depressed due to tinnitus. AR 652, 655.

United States District Court
Northern District of California

49. By letter dated July 31, 2024, Lincoln National denied Camp's claim for benefits. AR 464-74. Lincoln National determined, "[b]ased on the overall claim facts including the medical records received and the completed clinical reviews, the medical evidence does not support physical or psychiatric impairment which would result [in R/Ls] which would preclude" Camp from performing his occupational duties. AR 473.

**C. Plaintiff's Appeal**

50. On November 6, 2024, Camp appealed Lincoln National's decision. AR 489-500. Camp claimed that he could not work due to tinnitus, depression and anxiety. AR 492. When Plaintiff submitted his appeal, he provided medical records from ENG Facial Plastics & Allergy, Ascension Medical, Dr. Butterfield, Family Service Agency, a narrative report and functional abilities assessments from Dr. Rahhal, and a Mental Health Functional Abilities Assessment and medical records from McKibbin. AR 953.

51. Camp enclosed a letter dated October 30, 2024, from Dr. Rahhal stating that Camp's tinnitus caused "anxiety, distraction, significant lack of focus, decreased attention span and depressed mood." AR 515. Dr. Rahhal noted Camp has received medications to help alleviate and treat his symptoms and conditions. AR 515.

52. Dr. Rahhal also completed a mental health functional abilities assessment, dated October 30, 2024. AR 516. Dr. Rahhal indicated that Camp had "No/mild loss" in several categories of "basic mental activities of work on a regular and continuing basis [which] means 8 hours per day for 5 days per week," including: "(1) understand and remember complex instructions; (2) maintain attention and concentration for extended periods; (3) maintain regular attendance and be punctual; and (4) make simple work-related decisions." AR 516.

53. "No/mild loss" was defined on the form to mean that Camp had "No significant loss of ability in named activity; can sustain performance for 2/3 or more of 8-hour workday." AR 516.

54. Dr. Rahhal also indicated "No/Mild loss" for additional capacities including:

> [1] interact appropriately with the public; [2] ask simple questions or request assistance; [3] accepts instructions and respond appropriately to criticism from supervisors; [4] maintain socially

> appropriate behavior in a work setting; [5] adhere to basic standards of neatness and cleanliness; and [6] be aware of normal hazards and take appropriate precautions.

AR 516-17. As two remaining categories, "[g]et along with coworkers and peers without distracting them or exhibiting behavioral extremes" and "[r]espond appropriately to changes in routine work setting," Dr. Rahhal indicated only a "moderate loss." *Id.* Dr. Rahal asserted that Camp had decreased attention span and would be off task 25% or more of the time. AR 516.

55. Camp also enclosed a Mental Health Functional Abilities Assessment completed by McKibbin on September 30, 2024. AR 518. In contrast to Dr. Rahhal, McKibbin claimed that Camp had moderate, marked, or extreme loss in nearly every category of cognitive function. AR 518-19. McKibbin claimed that Camp was "slightly" restricted in his ability to perform ADLs, despite Camp's own statements that he performed ADLs independently. AR 519, 90-91.

56. Camp also enclosed additional records from Silverberg, including an August 18, 2024 record in which Camp reported that he was looking into volunteer work. AR 642. At a visit on August 22, 2024, Camp reported to Silverberg that he "got himself to the gym daily." AR 638.

57. On November 6, 2024, Camp saw therapist Maria Clark. AR 757. Camp's mental status exam showed that he was oriented, his appearance was appropriate, his speech was normal, and his behavior was appropriate. AR 757. Clark found Camp to be "moderately impaired" based on questionnaires he completed. AR 757-58.

58. On November 21, 2024, Lincoln National conducted a nurse review of Camp's documentation. AR 707. For Camp's physical complaints, the nurse recommended a review by a physician board certified in otolaryngology. AR 711. The nurse found that there was no evidence of severe psychiatric symptoms or intense treatment to support the need for sustained R/Ls from a mental health perspective. AR 711. Lincoln National provided the nurse review Camp for review and a response. AR 705-06.

59. On December 6, 2024, Dr. Hootan Zandifar, a specialist in otolaryngology, prepared a medical record review for Lincoln National. AR 719-23. Dr. Zandifar determined that

the following R/Ls were warranted from April 29, 2024, to May 3, 2025, due to hearing loss in the right ear:

> • No working at unprotected heights;
> • No operating motor vehicles;
> • No being around or operating heavy machinery;
> • No work/task requiring normal/intact hearing bilaterally;
> • No working in loud environments (>75 dB) where he is required to hear people, whether in person or on the phone; and
> • If phone calls are required, the ability to use his personal phone or a phone compatible with the technology to route audio directly to the claimant's hearing aids.

AR 722.

60. On December 16, 2024, Lincoln's vocational expert prepared an updated vocational assessment, updating the June 10, 2024 and July 10, 2024 assessments to address whether the R/Ls recommended by Dr. Zandifar would preclude Camp from his occupational duties. AR 730. The vocational expert found that none of the noted R/Ls would preclude Camp from working in his occupation:

> • No working at unprotected heights – not required;
> • No operating motor vehicles – not required by Plaintiff's job;
> • No being around or operating heavy machinery – not required;
> • No work/task requiring normal/intact hearing bilaterally – not required – unilateral hearing is sufficient;
> • No working in loud environments (>75 dB) where he is required to hear people, whether in person or on the phone – not required;
> • If phone calls are required, the ability to use his personal phone or a phone compatible with the technology to route audio directly to the claimant's hearing aids – possible within the occupation.

AR 730. Lincoln National provided camp with a copy of the updated vocational assessment with an opportunity to respond. AR 732.

61. On December 27, 2024, Dr. Bartindale completed an LTD Physician's Statement. AR 751-52. Dr. Bartindale identified Camp's diagnoses as tinnitus and asymmetrical sensorineural hearing loss, but he left the entire "Limitations and Restrictions" sections blank and indicated no date for "reduced ability to work" or "advised to stop work," even though the date "1/30/2024" was noted as the date "symptoms first appeared." AR 751-52.

62. By letter dated January 8, 2025, Dr. Rahhal responded as to Dr. Zandifar's proposed R/Ls that, "I agree with the restrictions made as it may assuage potentially associated

stress and anxiety in the workplace in the face of ongoing and persistent tinnitus, but the restrictions do not address patient's constant and disturbing tinnitus that he does have every day[.]" AR 784.

63. On February 12, 2025, Dr. Martin Lipschutz, a psychiatrist, prepared a psychiatric records review. AR 816-22. Dr. Lipschutz found that Camp's records did not support the claim of functional impairment due to psychiatric illness as of January 30, 2024. AR 816. Dr. Lipshutz concluded, "There were no clinical notes from any provider with mental status exams describing the claimant as having a significant psychiatric illness with cognitive abnormalities supporting functional impairment." AR 816.

64. By letter dated March 4, 2025, McKibbin stated that he disagreed with Dr. Lipschutz's report based on his "clinical assessments and inventories for" Camp. AR 856.

65. By letter dated March 11, 2025, Dr. Rahhal asserted that Camp's tinnitus had worsened over time, and his depression and anxiety "interfere[d] with his functioning during the day," claiming that Camp reported continual tinnitus. AR 863.

66. By letter dated April 17, 2025, Lincoln National upheld its decision to deny benefits. AR 952. Lincoln National noted that Camp claimed his absence from work as of January 30, 2024, was due to "left ear tinnitus, and subsequent depression, anxiousness, irritability, and diminished concentration due to his tinnitus." AR 952. LTD benefits had been denied as Lincoln National's evaluation had concluded that he was not disabled as set forth by the Policy throughout the entire 90 day elimination period up to April 29, 2024.

67. Lincoln National's appeal uphold letter restated the various records and opinions on which its determination rested. AR 954. This included the reviewing nurse's acknowledgement of Camp's depression, anxiety, and insomnia from his tinnitus, which had been managed with medication and intermittent therapy with ongoing improvement in symptoms and minimally abnormal exams. *Id.* The nurse expected management and therapy to continue, but she found a lack of "medical evidence of a severity of psychiatric symptoms or intensity of treatment to support the need for sustained R/Ls from a mental health perspective." *Id.* The appeal uphold

United States District Court
Northern District of California

letter also cited the R/Ls from Dr. Zandifar, the otolaryngologist, as well as the review conducted by Dr. Lipshutz, the psychiatrist. *Id.*

68. Significantly, Dr. Lipshutz concluded that the records did not support findings of functional impairment due to a psychiatric illness from January 30, 2024, forward, acknowledging each record and visit from the multiple providers during the initial 90-day elimination period as well as after this period. AR 955-56. Lincoln National's appeal letter upholding the denial included the following assessments by Dr. Lipshutz regarding Plaintiff's medical records and care:

> The 04/04/24 correspondence from LCPC McKibbin recommended disability for the claimant due to anxiety/depression but gave no exam findings supporting the need for restrictions and limitations.
>
> The 04/05/24 medical note from Dr. Bartindale contained no psychiatric symptoms in the history or psychiatric findings in the exam.
>
> The 04/12/24 APS from an unidentified provider said the dates of restrictions and limitations were 01/30/24 to indefinite, but gave no exam findings supporting this opinion.
>
> The 04/30/24 provider statement from LCPC McKibbin said the claimant was functionally impaired due to severe tinnitus; had depression/anxiety, sadness, agitation, loss of energy, irritability, concentration difficulty, tiredness, and loss of appetite. However, there were no mental status findings supporting this opinion.
>
> The medical notes from Dr. Butterfield of 06/25/24, 07/09/24 and 07/30/24 consisted of the claimant's self-reported symptoms and self-report scale scores. The exams of 06/25/24 and 07/30/24 were identical and unremarkable; the note of 07/09/24 had no exam.
>
> The correspondences from Dr. Rahhal of 07/02/24, 10/30/24, and 01/08/25 said the claimant was impaired due to tinnitus, insomnia, anxiety, and depression, with distraction, lack of focus, decreased attention. However, there were no exams from Dr. Rahhal documenting the claimant's findings.
>
> The 07/02/24 assessment from LPC Goltsman consisted of the claimant's self-reported symptoms and self-reported scale scores with a normal mental status exam.
>
> The therapy notes from LPC Silverberg from 07/10/24-08/22/24 consisted of the claimant's self-reported symptoms, with no mental status exams, though the claimant was described as having a euthymic mood and showed insight.
>
> The 07/30/24 psychiatric evaluation from PMHNP Caligiuri consisted of the claimant's self-reported symptoms but had a normal mental status exam.

United States District Court
Northern District of California

AR 955-56.

68. Ultimately, Lincoln National's letter upholding the denial concluded:

> We acknowledge his self-reported symptoms related to tinnitus, as well as his mental nervous diagnoses, however based on the medical documentation on file as well as medical evaluations, the records contained in his file do not support restrictions and limitations or functional impairment which would prevent him from performing his Own Occupation.

AR 958. Moreover, "the existence of a medical condition or diagnosis(es) in and of itself does not equate to eligibility for disability benefits. The focus of our assessment was not whether or not a condition exists; but rather whether or not impairment exists that would preclude him from performing the duties of his own occupation." *Id.* Lincoln National found the evidence failed to support impairment, upheld the denial of benefits on appeal, and confirmed that Plaintiff had exhausted administrative remedies for his claim. *Id.*

## II. CONCLUSIONS OF LAW

### A. Legal Standards

1. Under ERISA Section 502(a)(1)(B), a participant, beneficiary, or fiduciary may bring a civil action to recover benefits due to them under the terms of an ERISA plan, to enforce their rights under the terms of the plan, or to clarify their rights to future benefits under the terms of the plan. *See* 29 U.S.C. § 1132(a)(1)(B).

2. The Court has subject-matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1331 and Title 29 U.S.C. § 1132(e).

3. The parties agree that this case is properly resolved by the Court through findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a), without a jury. "Under Rule 52, the Court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true." *See McCulloch v. Hartford Life & Accident Ins. Co.*, No. 19-CV-07716-SI, 2020 WL 7711257, at *7 (N.D. Cal. Dec. 29, 2020) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999) (en banc)); *see also* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").

Judicial review in this ERISA benefits action is limited to the administrative record that was before Lincoln National at the time of its final benefits determination dated April 17, 2025.

4. A denial of ERISA benefits "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) ("De novo is the default standard of review."). The parties agree that the de novo standard of review applies. *See* Dkt. No. 26 at 14; Dkt. No. 28 at 20. Under de novo review, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010) (holding that, in an ERISA action for the denial of disability benefits, the burden of proof is on the claimant when the standard of review is de novo). "When a district court reviews de novo a plan administrator's determination of a claimant's right to recover long term disability benefits, the claimant has the burden of proving by a preponderance of the evidence that he was disabled under the terms of the plan." *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1162-63 (9th Cir. 2016). The burden of proof remains on the claimant even "when disability benefits are terminated after an initial grant." *See Muniz*, 623 F.3d at 1296.

**B. Plaintiff's Entitlement to Benefits under the Policy**

5. The Court begins its analysis with a focus on whether Camp carried his burden to show entitlement to benefits under the Policy. Camp argues that Lincoln National wrongfully denied his claim for benefits because his "diagnoses were supported by the results of objective medical findings." Dkt. No. 26 at 21. But regardless of his particular diagnoses, Camp must present proof of disability. *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of disability. A claimant bears the burden of proving that an impairment is disabling."). The AR demonstrates that Camp fails to establish that his diagnoses rendered him disabled by a preponderance of the evidence.

6. First, Camp fails to demonstrate that his tinnitus and asymmetrical hearing loss caused a physical impairment which rendered him disabled through and after April 29, 2024, the end of the Policy's 90-day elimination period. On May 22, 2024, Lincoln National's reviewer, Dr. Song, determined that, despite his diagnoses, Camp was capable of working for a period of six to 12 months with just two R/Ls: (1) no safety sensitive activities, including working at unprotected heights or operating heavy machinery; and (2) ability to use a headset with compatible hearing aids. AR 287. Similarly, on December 6, 2024, Dr. Zandifar determined that Camp was capable of working with the following R/Ls in place:

> • No working at unprotected heights;
> • No operating motor vehicles;
> • No being around or operating heavy machinery;
> • No work/task requiring normal/intact hearing bilaterally;
> • No working in loud environments (>75 dB) where he is required to hear people, whether in person or on the phone;
> • If phone calls are required, the ability to use his personal phone or a phone compatible with the technology to route audio directly to the claimant's hearing aids.

AR 722. By letter dated January 8, 2025, Camp's treating physician, Dr. Rahhal, stated that he agreed with Dr. Zandifer's proposed R/Ls because they may "assuage potentially associated stress and anxiety in the workplace," although he noted they would not change the tinnitus. AR 784. Lincoln National's other board-certified otolaryngologist, Dr. Egan, opined that, "[w]ith the use of [hearing aids], there are no disability restrictions/limitations supported from an otolaryngology perspective." AR 455. Lincoln National's vocational expert determined that Camp was capable of performing his Own Occupation as an account executive with the recommended R/Ls in place. AR 730. Specifically, the vocational expert determined that Camp's Own Occupation did not require him to work at unprotected heights, work around or operate heavy machinery, have normal bilateral hearing, or work in loud environments (>75 dB). AR 730. Similarly, Camp's Own Occupation did not require him to operate a motor vehicle, and it allowed him to use his personal phone or a phone compatible with technology to route audio to Camp's hearing aids. AR 730. Therefore, Camp failed to establish that he was unable to perform his Own Occupation due to tinnitus or hearing loss. *See Matthews*, 10 F.3d at 680; *see also Caskey v. Prudential. Ins. Co. of Am.*, 473 F. Supp. 3d 644 (M.D. La. 2020) (upholding an insurance company's decision to deny a

United States District Court
Northern District of California

claim for benefits based on tinnitus because "the overwhelming evidence from both Plaintiff's treating providers and the four independent medical reviewers" concluded "that the only limits/restrictions on Mr. Caskey's ability to work were . . . [c]ombined ear protection utilizing both ear plugs and external muffs in work areas where sound levels approach or exceed 105 dB" and "[r]emoval for 15 minutes every two hours from areas of 105 dB or greater sound levels," which were not a regular part of his occupation).

7. Second, Camp failed to establish that tinnitus impaired his ability to concentrate and perform the cognitive demands of his occupation as an account executive. AR 380, 356. On April 21, 2024, Camp completed an activities questionnaire in which he reported that he remained capable of communicating with others in person and over the phone, but also that he was able to perform all ADLs independently, including opening and responding to mail, managing his finances, and balancing his checkbook, all of which require some degree of concentration. AR 89-91. Similarly, Dr. Rahhal's mental health functional abilities assessment dated October 30, 2024, also supports that Camp had the cognitive ability to perform his Own Occupation. AR 516. Dr. Rahhal indicated that Camp had "No/Mild Loss" in ten categories including: understanding and remembering complex instructions; maintaining attention and concentration for extended periods; maintaining regular attendance and be punctual and interact appropriately with the public; accepting instructions and responding appropriately to criticism from supervisors; and being aware of normal hazards and taking appropriate precaution. AR 516-17. These ongoing capabilities do not reflect a disabling cognitive impairment. Additionally, Camp's medical records demonstrate that his speech remained normal and his behavior appropriate throughout his various assessments, further undermining his claim of impaired communication. AR 757.

8. Third, Camp fails to substantiate that the depression he suffered as a result of his tinnitus rendered him disabled. The AR does not contain any evidence of psychiatric impairment. Indeed, Lincoln National's psychiatric experts, Dr. Morthala and Dr. Lipschutz, agreed that Camp's records did not support functional impairment due to psychiatric illness and no R/Ls were warranted. As Dr. Lipschutz highlighted, "There were no clinical notes from any provider with mental status exams describing the claimant as having a significant psychiatric illness with

cognitive abnormalities supporting functional impairment." AR 816. Although Camp's therapist, McKibbin, contended that Camp's condition interfered with his ability to work, he failed to identify any corroborating or documented evidence beyond Camp's own claims supporting this assertion, such as reports of Camp's alleged impairment impacting his ability to communicate during therapy sessions or to perform ADLs. Indeed, Camp's score on the therapist's personality assessment screener dated March 20, 2024, was not indicative of impairment. AR 370-71. Camp's claim of disabling mental health concerns was thus primarily based on his self-reports to his providers that he could not work rather than on their examinations and clinical findings. "[W]here," as here, "the evidence of disability is primarily derived from the treating physician's recording of the patient's self-reported symptoms, courts have repeatedly recognized that this evidence alone does not support a finding that the claimant has a disabling condition where those self-reports are not supported." *Jump v. Unum Life Ins. Co. of Am.*, No. 5:22-cv-01812-SSS-SHKx, 2024 WL 6874514, at *12 (C.D. Cal. Dec. 6, 2004).

9. There appears to be no dispute that Camp was diagnosed with multiple medical conditions, including tinnitus, mild sensorineural hearing loss, depression, and insomnia, but Camp has presented no evidence competing with Lincoln National's to establish that the diagnoses rendered him unable to perform the functions of his Own Occupation. Camp failed to demonstrate his disability and thus failed to demonstrate his entitlement to benefits under the Policy.

**C. Lincoln National's Interpretation and Application of the Policy**

10. Camp argues that Lincoln National's denial decision was wrong because the plan administrator improperly required him to provide objective evidence of his disability. Dkt. No. 26 at 22. The Policy states that an insured must submit proof of loss demonstrating "the character and the extent of the loss for which claim is made." AR 54. The Policy further states that "[w]ritten proof of loss must be furnished to the insurer, in the case of a claim for [LTD] benefits, within 90 days, after the termination period for which the insurer is liable." AR 54. Proof is defined as "written proof covering the occurrence, the character and the extent of the loss for which the claim is made." AR 32. Thus, per the plain terms of the Policy, Camp was required to

establish his entitlement to benefits through written proof. Lincoln National correctly interpreted Camp's evidentiary obligations under the Policy.

11. Contrary to Camp's argument, e.g., Dkt. No. 32 at 11-12, Lincoln National did not add a requirement that Plaintiff provide written substantiation of impairment – that requirement already exists in the Policy. "While the lack of objective evidence played an important part in the decision, the record does not demonstrate that [the administrator] improperly demanded objective evidence without informing Plaintiff or that it altered the requirements of the" Policy. *Safavi v. SBC Disability Income Plan*, 493 F. Supp. 2d 1107, 1118 (C.D. Cal. 2007). Plaintiff "essentially argues that Defendant should not be allowed to take the lack of objective evidence into account in making its decision," but "an administrator is not required to limit its review in this way." *Id.* "[N]umerous Courts have concluded that an administrator does not abuse its discretion by requiring objective evidence of an inability to function in the workplace." *Holifield v. Unum Life Ins. Co. of Am.*, 640 F. Supp. 2d 1224, 1237 (C.D. Cal. 2009) (internal quotations omitted). Lincoln National's denial of LTD benefits here rested not on a disagreement with Plaintiff's diagnoses; rather, it rested on his failure to demonstrate that the diagnoses resulted in a disability that prevented him from working in his Own Occupation. On that basis, the Court cannot find Lincoln National's denial improper.

12. Camp next claims that Lincoln National denied his claim solely because of a lack of objective evidence. This position is belied by the AR. Lincoln National weighed Camp's subjective reports of impairment in reaching its claim determination but found that there was insufficient evidence of disability. Indeed, in the denial letter, Lincoln National acknowledged that Camp "may have experienced symptoms as of April 29, 2024," but found that "the information within his file, does not contain sufficient physical or mental exam findings, diagnostic test results or other forms of medical documentation supporting his symptoms and impairments remained of such severity and frequency that they resulted in [R/Ls] rendering him unable to perform the duties of his occupations as of April 29, 2024." AR 964. In a similar case, the claimant argued that the defendant impermissibly imposed a requirement that he put forward objective evidence of his symptoms. *Biggar v. Prudential Ins. Co. of Am.*, 274 F. Supp. 3d 954,

United States District Court
Northern District of California

968 (N.D. Cal. 2017). The court upheld the insurance company's decision because the insurer considered the insured's subjective reports of his symptoms but found that those reports contradicted the objective examination records, and that the objective evidence was more reliable. *Id.* at 969. Here, too, Lincoln National properly considered Camp's subjective self-reports, but found that they were unreliable in light of the lack of corroborating evidence, including physical exams, medical records, diagnostic test results and other medical documentation. Lincoln National reasonably denied the claim based on the record as well as Camp's failure to proffer objective evidence.

**D. Lincoln National's Evaluators**

13. Resisting the conclusion that Lincoln National reasonably denied his claim, Camp seeks to undermine the opinions of Lincoln National's evaluators. Camp argues that the opinions of Dr. Song, Dr. Morthala, Dr. Egan, Dr. Zandifar, and Dr. Lipschutz should receive less credence than those of Camp's treating physicians/providers because (1) they are not truly independent; (2) the opinions of "paper review" physicians are inherently less reliable than those of treating physicians; and (3) the "paper reviewers" were not provided with all the relevant information. The Court takes up the first and second arguments in the following paragraphs. Because the "relevant information" purportedly withheld from the "paper reviewers" was limited to Camp's earlier receipt of short-term disability benefits, the Court takes up that argument in the following section.

14. In the first attack on Lincoln National's evaluators, Camp avers that the Court should distrust the evaluators because Lincoln National did not proffer evidence of their independence. *See* Dkt. No. 32 at 16-17. But Camp fails to cite a single case informing the Court's consideration of such evaluators' opinions. The Supreme Court guides that purported conflicts of interest between evaluators, insurers/plan administrators, and claimants should be considered as one factor in assessing ERISA plan claims denials. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116-17 (2008). And here, Camp did not submit any extrinsic evidence of bias of the sort that Courts consider in weighing potential conflicts of interests of this sort, such as statistics regarding Lincoln National's rate of claims denials or how frequently it contracts with the file reviewers it employed in this case. *See id.*; *Abatie*, 458 F.3d at 968-69; *cf. Nolan v. Heald*

United States District Court
Northern District of California

*Coll.*, 551 F.3d 1148, 1152 (9th Cir. 2009). On this record, Camp fails to establish a conflict of interest that requires the Court to disregard the opinions of Lincoln National's evaluators.

15. Regarding the second attack on Lincoln National's evaluators, Camp's point is well-taken as a general matter. The opinions of evaluators who personally examine a claimant typically deserve more credence than the opinions of those whose review remains limited to a cold record. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011).[3] But as noted above, Camp improperly conflates diagnosis with designation of disability, and the AR lacks any conflict between the diagnoses of Camp's physicians and service providers, on the one hand, and the estimations of accommodations and R/Ls identified by Lincoln National's evaluators, on the other.

16. For example, Dr. Zandifar determined that Camp was capable of working with the following R/Ls in place:

> • No working at unprotected heights;
> • No operating motor vehicles;
> • No being around or operating heavy machinery;
> • No work/task requiring normal/intact hearing bilaterally;
> • No working in loud environments (>75 dB) where he is required to hear people, whether in person or on the phone;
> • If phone calls are required, the ability to use his personal phone or a phone compatible with the technology to route audio directly to the claimant's hearing aids.

AR 722. Dr. Zandifar concluded that R/Ls "indicating that the claimant was not able to work for the timeframes in questions are not supported." AR 723. Dr. Zandifar stated that Plaintiff was capable of working with the R/Ls identified above. *Id.* Camp does not offer any countervailing evidence related to these R/Ls, and he thus fails to show that the medical providers that personally evaluated him should merit greater consideration. Camp ultimately fails to demonstrate that the Court should disregard the opinions of Lincoln's evaluators, and he fails to overcome his failure to demonstrate entitlement to benefits.

---

[3] As other courts have determined, "consulting physicians' opinions based on reviews of medical records are an acceptable basis of an administrator's determination." *Constantino v. Aetna Life Ins. Co.*, No. SACV 12-0921-JGB (ANx), 2014 WL 5023222 at *7 (C.D. Cal. Oct. 8, 2014).

United States District Court
Northern District of California

**E. Relevance of Lincoln National's Approval of Short-Term Disability Benefits**

17. Camp argues that he was entitled to LTD benefits simply because Lincoln National paid his claim for short-term disability benefits. *See* Dkt. No. 32 at 20-21. Not so. The short-term disability plan is a different contract than the Policy at issue with its own terms, conditions, exclusions and limitations. Significantly, the short-term disability plan is not part of the AR filed with the Court because it is not relevant to the determination of whether Camp is entitled to LTD benefits under the Policy at issue. Even under the same ERISA plan, different policies require different analyses. *See Ellis v. Egghead Software STD & LTD Plans*, 64 F. Supp. 2d 980, 984 (E.D. Wash. 1999) (analyzing the long-term disability and short-term disability policies with different standards of review based on their different terms). Camp argues that previous approval of a plaintiff's disability claim "weighs in favor of the conclusion that she continues to have disabling medical conditions." Dkt. No. 32 at 21 (quoting *Iravani v. Unum Life Ins. Co. of Am.*, 692 F. Supp. 3d 904, 921 (N.D. Cal. 2023)). But Camp's reliance on *Iravani* misses the mark because the claim denial at issue there followed an earlier grant of benefits under the same plan, not a different plan such as the distinct short-term disability plan Camp seeks to rely on here. The short-term disability plan is not relevant to the instant analysis, and Camp fails to cite any authority to the contrary. Thus, Camp's argument that his earlier satisfaction of the short-term disability plan's requirements means that he must have satisfied the LTD Policy's requirements is unavailing.

//

//

//

//

//

## III. CONCLUSION

For the foregoing reasons, the Court **DENIES** Camp's motion for judgment and **GRANTS** Lincoln National's motion for judgment. The Court **ORDERS** Lincoln National to submit a proposed form of judgment for the Court's signature both on the docket and in Word version to amopo@cand.uscourts.gov by September 10, 2026. Camp may file an objection to the form of judgment, if any, by September 15, 2026.

**IT IS SO ORDERED.**

Dated: September 3, 2026

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**